## APPEAL OF LEVINE BROTHERS CO., INC.

Docket No. 6832. Promulgated November 30, 1926.

1. The Board will not consider questions of administrative policy and procedure. *Appeal of Cleveland Home Brewing Co.*, 1 B. T. A. 87.

2. Accelerated depreciation of machinery allowed.

3. Reduction of surplus in the computation of invested capital upon payment of additional taxes for preceding year sustained.

4. The reduction of current earnings by a tentative tax to determine the amount of such earnings available for the retirement of capital stock disallowed. *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135.

5. Evidence of loss of useful value *held* sufficient to sustain claimed deduction.

*Benjamin Mahler, Esq.*, for the petitioner.
*M. N. Fisher, Esq.*, for the Commissioner.

This is an appeal from the determination of a deficiency of $1,972.08 in income and profits tax for 1918. The deficiency arises from the Commissioner's refusal to allow more than a 10 per cent rate of depreciation on machinery, and from adjustments in invested capital which petitioner contends were erroneous. The petitioner presents in addition the question of loss of useful value as to certain machines.

#### FINDINGS OF FACT.

The petitioner is a New York corporation, located at 32 South 9th Street, Brooklyn, and is engaged in the manufacture and sale of candy.

Levine Brothers Co., Inc., was incorporated in July, 1908, succeeding a partnership operating under the trade name of Levine Bros. The entire capital stock of the corporation, amounting to $25,000, was issued for the assets of the partnership. Up to and

including June 30, 1912, the corporate accounts were kept on a fiscal year basis. In 1912 the petitioner changed to a calendar year basis, the books being closed on June 30 and also on December 31. Thereafter the books were kept on a calendar year basis.

In June, 1913, the corporation increased the capital stock outstanding from $25,000 to $200,000 by the declaration of a dividend of $39,000, by subscription of additional stock amounting to $16,000, and by setting up a value for good will of $120,000.

Prior to March 1, 1918, the petitioner manufactured and sold its own products. On that date, the Elbee Chocolate Co. was organized to take over the manufacturing part of the petitioner's business. Practically all of the assets of the petitioner were transferred to the Elbee Company for stock, the petitioner thereafter handling only the selling and distribution. On or about April 1, 1918, the Sterling Chocolate Co. was organized to manufacture solid chocolate for the Elbee Company. Prior to the organization of the latter company, the petitioner bought solid chocolate on the open market. The stock of all three companies was owned by the same stockholders and in the same proportion.

At the incorporation of the Elbee Company, the petitioner turned over the machinery to the former. The petitioner's machinery account on December 31, 1917, was $61,806.45; on March 1, 1918, it was $63,300.35; and on December 31, 1918, the machinery account of the Elbee Company was $75,567.33. The machinery purchased for the Sterling Company to manufacture solid chocolate was almost all new. The machinery account of the Sterling Company at December 31, 1918, was $33,582.47.

Included in the new machines purchased for the Sterling Company was a Woodburn Cocoa Mill costing $1,200, a Bausman Disc Reducer and Refiner costing $3,960, and a cocoa press costing $5,500. These machines were purchased to make powdered cocoa. A chocolate wrapper costing $2,800, which was used to wrap chocolate almond bars, was also purchased.

After the signing of the Armistice, the price of cocoa dropped from about 30 cents to 3 cents per pound. The petitioner could not produce powdered cocoa at such prices in competition with larger concerns, so it discontinued the manufacture thereof and the use of the above machines in the latter part of 1918. The manufacture of the chocolate almond bar also had to be dropped in 1918 because of competition and the machine for wrapping it was no longer used. These four machines were offered for sale in 1918 and have been repeatedly offered since, but without success. The machines, as of December 31, 1918, were worth but 10 per cent of their cost.

During 1918 the Elbee Company worked a double shift until some time in November. The regular shift worked 48 hours per week.

The extra shift worked until 10:30 p. m., the total overtime amounting to 30 hours per week. The daily operation of the machinery continued without interruption upon the transfer of assets from the petitioner to the Elbee Company. Beginning in April the Sterling Company operated the same hours and shifts as the Elbee Company.

Labor conditions during 1918 necessitated the employment of unskilled and inexperienced help. The machinery did not receive the proper care for the most efficient operation. The employees were shifting constantly and conditions were unsettled. Cases of sabotage resulted in gears, spokes and other parts of ,the machinery being broken.

The machinery was made to handle powdered sugar but, due to war conditions, brown sugar was substituted and substitutes for other ingredients had to be used. The additional strain resulted in excessive depreciation of the machinery. The rate of depreciation of the machinery for 1918 was 15 per cent.

During 1917 or prior thereto the petitioner, in order to secure a distributor for its products, made certain advances to A. Strauch & Co., amounting to about $10,000. These advances were secured by shares of stock of Strauch & Company, which were later exchanged for notes. The date of this exchange is unknown, but it occurred prior to January 1, 1918. On that date $5,100 was still due and unpaid on the notes. By March 1, 1918, the notes had been satisfied. The Commissioner adjusted invested capital on the theory that the petitioner held stock of Strauch & Company which was an inadmissible asset.

For 1911, 1912 and 1913, Levine Brothers, Inc., returned income as follows:

| | |
|---|---|
| 1911 | $3, 507. 59 |
| 1912 | 13, 594. 81 |
| 1913 | 24, 973. 70 |

The Commissioner reduced the income for 1911 and 1912 by $447.60 and $467.60, respectively.

In 1921 the petitioner paid an additional tax of $1,235.33 for the year 1917, as a result of which the Commissioner reduced surplus in computing invested capital for the year 1918.

On March 1, 1918, the petitioner retired $150,000 of its capital stock. The Commissioner determined that there were earnings of $9,432.33 available for the retirement of such stock, after having first deducted an estimated tax of $10,833, and reduced the surplus accordingly.

### OPINION.

MORRIS: The first assignment is that the " Commissioner erred in not stating in his communication of July 16, 1925, the details of the

deficiency but incorporating them by reference to prior communications not part of the deficiency letter." This question is one of administrative policy and procedure within the Internal Revenue Bureau. We have said in connection therewith, in *Appeal of Cleveland Home Brewing Co.*, 1 B. T. A. 87, 91:

It is no part of the duty of this Board, nor has it the right, to decide in any manner questions of policy in the administration of the office of the Commissioner.

See also *Appeal of Clois L. Greene*, 2 B. T. A. 148; *Appeal of Southern California Loan Association*, 4 B. T. A. 223.

The petitioner withdrew the second assignment of error that the Commissioner erred in disallowing the deduction of legal expense in the sum of $130.36.

The next question presented is the proper rate of depreciation to be applied to the petitioner's machinery, the Commissioner having allowed a rate of 10 per cent. The testimony shows that the machinery was used overtime during the greater part of the year, that much additional strain was placed on the machinery due to substitutes which had to be used, and that labor conditions were such that inexperienced workers and unskilled labor had to be used in order to operate the machines. In view of these facts, we are of the opinion that 15 per cent, as claimed by petitioner, is a reasonable rate for depreciation.

The next allegation of error relates to the reduction of invested capital for the year 1918 by reason of additional taxes paid for 1917. Since the filing of this appeal the Revenue Act of 1926 has been passed by Congress. Section 1207 of that Act approves the regulations of the Commissioner applicable to reducing invested capital on account of the payment of additional taxes for a preceding year. See *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168; *Appeal of Hutchins Lumber & Storage Co.*, 4 B. T. A. 705; *Appeal of Manville Jenckes Co.*, 4 B. T. A. 765.

The fifth error assigned is the reduction of invested capital on account of inadmissible assets. The Commissioner's action was apparently based on an understanding that during the taxable year the petitioner owned stock of Strauch & Company. The evidence shows, however, that advances were made to Strauch & Company and that shares of stock of that company were held as security for the loan, but prior to January 1, 1918, these shares were exchanged for notes, and on that date the petitioner held notes amounting to $5,100. The Commissioner was therefore in error in reducing invested capital on account of inadmissible assets.

The next question, namely, the correctness of the Commissioner's action in reducing current earnings by a tentative tax to determine

the amount of such earnings available for the retirement of capital stock, has already been decided adversely to the Commissioner. *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135; *Appeal of Hutchins Lumber & Storage Co.*, *supra.* Upon the authority of these decisions we must hold that the Commissioner's action in this respect is in error.

The seventh assignment of error is the reduction of net income for the prewar years 1911 and 1912. The Commissioner admitted the reduction of income for the two years but denied reducing them without cause. Petitioner offered no evidence whatsoever other than the net income returned and the reduction sustained. In the absence of proof of error the reduction must be sustained.

The final assignment of error, which was presented by an amendment to the original petition, relates to the allowance of a loss of useful value on four machines which were purchased in 1918 and discarded prior to the close of that year. These machines, purchased and installed by the petitioner to manufacture cocoa and wrap chocolate almond bars, were, with the exception of the wrapping machine, in use at a time when the trade was clamoring for powdered cocoa. The Sterling Company was able to manufacture powdered cocoa because the process was the same as in the manufacture of solid chocolate up to a certain step. In 1918 the demand was exceptionally good and the price was high, being about 30 cents per pound. The same general conditions existed as to the almond bars which petitioner attempted to place on the market. But after the Armistice the demand practically ceased, stocks available for distribution were large, and the price fell to about 3 cents per pound. Only the larger manufacturers were able to produce powdered cocoa at such prices. Many concerns placed their machinery on the market for sale. Petitioner has repeatedly offered its machines for sale but has not been able to secure an offer at any price. As to the wrapping machine, the manufacturer failed to ship it to petitioner in time for more than a week or so of use before the drop in prices made the manufacture of almond bars prohibitive. The petitioner has been ready and willing at all times since 1918 to sell the machines for one-tenth of their original cost, but has been unable to sell them. The machines have been idle and of no use since 1918. On these facts, we are convinced that the petitioner is entitled to deduct the difference between the cost of these machines and the salvage value thereof, which is 10 per cent of such cost, in its 1918 return. *Appeal of Automatic Transportation Co.*, 3 B. T. A. 505.

> *Judgment will be entered on 15 days' notice, under Rule 50.*